**ORIGINAL**

# In the United States Court of Federal Claims

Pro Se
No. 14-632L
(Filed: March 29, 2016)

FILED
MAR 29 2016
U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| GENE CHITTENDEN, et al., ) | Keywords: Mining Act of 1872; 30 U.S.C. § 26; Fifth Amendment Takings Clause; Motion to Dismiss; RCFC 12(b)(1); Summary Judgment; RCFC 12(b)(6); 36 C.F.R. § 224.8. |
| Plaintiffs, ) |  |
| v. ) |  |
| THE UNITED STATES OF AMERICA, ) |  |
| Defendant. ) |  |

*Gene Chittenden*, Auburn, CA, Plaintiff, *pro se*.

*Allen D. Hall*, N. San Juan, CA, Plaintiff, *pro se*.

*Carter Fleeth Thurman*, Trial Attorney, with whom was *John C. Cruden*, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiffs in this action, Gene Chittenden and Allen D. Hall, hold unpatented mining claims on two lode mines located in the Tahoe National Forest in California. Plaintiffs claim that when the United States Forest Service installed bat gates on the shaft and portal of the mines it "intentionally, negligently and [tortiously]" destroyed their claims, violated their rights under the Fifth Amendment's Due Process Clause, and effected a taking of their property for which they are owed compensation under the Fifth Amendment's Takings Clause. See Compl. at 1–2, ECF No. 1.

Currently before the Court are: 1) the government's motion to dismiss Plaintiffs' tort and due process claims for lack of jurisdiction pursuant to Rules of the Court of Federal Claims (RCFC) 12(b)(1); and 2) the parties' cross-motions seeking summary judgment pursuant to RCFC 56 on the takings claim. ECF Nos. 16–17.

For the reasons set forth below, the Court finds that it does not have jurisdiction over Plaintiffs' tort and due process claims, and so **GRANTS** the government's motion to dismiss those claims under RCFC 12(b)(1). Further, the Court concludes that the installation of the bat

1

gates did not constitute a taking of property within the meaning of the Fifth Amendment. Accordingly, the government's motion for summary judgment is **GRANTED** and Plaintiffs' motion is **DENIED**.

## BACKGROUND

### I. Statutory and Regulatory Framework

"To encourage private development of mineral deposits, federal law permits private parties to discover, explore, and reclaim mineral deposits in federally-owned lands." Kunkes v. United States, 78 F.3d 1549, 1550 (Fed. Cir. 1996) (citing 30 U.S.C. § 22 (2012) ("[A]ll valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States . . . under regulations prescribed by law.")); see also United States v. Locke, 471 U.S. 84, 86 (1985). As provided in the Mining Act of 1872, 30 U.S.C. § 26, "[t]he locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, [and] their heirs and assigns . . . so long as they comply with the laws of the United States . . . shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth." 30 U.S.C. § 26.

Pursuant to regulations implementing the Mining Act, when an individual discovers a valuable mineral deposit on federal land, he or she can formally "locate" the mine by staking out the claim, posting notice at the site describing the area claimed, and recording the notice with the Bureau of Land Management (BLM). See 43 C.F.R. § 3832.11. By locating the mine and complying with regulatory requirements, the claimant asserts a possessory interest in federal land for mining purposes. Kunkes, 78 F.3d at 1551 (citing Locke, 471 U.S. at 86).

Mines located in a national forest are subject to additional regulation by the United States Forest Service, which is charged with protecting the surface resources of the national forests and parks. See 16 U.S.C. § 551; 36 C.F.R. § 228. In particular, claimants who wish to undertake mining operations within the borders of a national forest must submit a "notice of intent" to operate with the District Ranger assigned to the area if their operations "might cause significant disturbance of surface resources." 36 C.F.R. § 228.4. But a claimant may be exempted from the requirement to file a notice of intent if, among other things, the planned operations: 1) "will be limited to the use of vehicles on existing public roads or roads used and maintained for National Forest System purposes;" 2) will consist of "[p]rospecting and sampling which will not cause significant surface resource disturbance;" 3) will involve "[u]nderground operations which will not cause significant surface resource disturbance;" or 4) "will not involve the use of mechanized earthmoving equipment, such as bulldozers or backhoes, or the cutting of trees, unless [the planned operations] otherwise might cause a significant disturbance of surface resources." Id. § 228.4(a)(1).

When a notice of intent to operate is required, it must "provide information sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations, and the method of transport." Id. § 228.4(a). Under the regulations, "[t]he District Ranger will, within 15 days of receipt of a notice of intent to operate, notify the operator if approval of a plan of operations is required before the operations may begin." Id. § 228.4(a)(2).

2

Such a plan will be required if the District Ranger concludes the operation "is causing or will likely cause significant disturbance of surface resources." Id. § 228.4(a)(4). The plan of operations must identify, among other things, the types of activities proposed, the access routes, the type of transportation the operator intends to use, the period of time operations will be conducted, and "measures to be taken to meet the requirements for environmental protection." Id. § 228.4(c)(3).[1]

Finally, the regulations require a claimant to submit a proposed plan of operations in lieu of a notice of intent to operate if the proposed operations "will likely cause a significant disturbance of surface resources" or if their current operations "are causing a significant disturbance of surface resources but are not covered by a current approved plan of operations." Id.

## II.  Factual Background[2]

### A.  Chittenden and Hall's Mining Claims

Gene Chittenden and Allen Hall claim to have discovered mineral deposits located in lode mines at two locations in the Tahoe National Forest in Sierra County, California. Compl. at 7. The two mines are the Roye Sum lode mine and the Dolliegeek lode mine. Both mines are accessed through the same entrance (or "portal"). Def.'s Mot. for Summ. J. and Mot. to Dismiss (Def.'s Mot.) at 6 & n.5, ECF No. 16.

On September 12, 2009, Mr. Chittenden and Mr. Hall physically posted a "Lode Mining Claim Notice" for the Roye Sum mine at its entrance. Def.'s Mot. Ex. 3. A notice was subsequently filed with the Bureau of Land Management on December 9, 2009, formally locating the mine. Id.[3]

---

[1] In particular, mine operators must "minimize adverse environmental impacts on National Forest surface resources" by addressing the effects of their operations on air quality, water quality, solid waste, scenic values, fisheries and wildlife habitat, and roads. Id. § 228.8(a)–(f). Further, "[u]pon exhaustion of the mineral deposit or at the earliest practicable time during operations, or within 1 year of the conclusion of operations . . . [the] operator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources." Id. § 228.8(g).

[2] Except as noted, the facts set forth in this section are not in dispute and are based upon the pleadings and the declarations, photographs, and other documentary evidence submitted by the parties.

[3] Plaintiffs also filed a "Lode Mining Claim Location Notice" for the Dolliegeek mine with the BLM on March 1, 2010. Def.'s Mot. Ex. 14. However, because both mines are accessed through the single portal in which the Forest Service ultimately installed one of the bat gates that are at issue in this case, the Court will refer to the Roye Sum mine as including both claims.

3

### B. Installation of the Bat Gates

In the spring of 2009, the Forest Service proposed to clean up a number of abandoned mine sites using funds available through the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 604, 123 Stat. 115, 170. Thereafter, on October 8, 2009, the Forest Service published notice of its intent to "implement mine site reclamation activities that would reduce or eliminate physical safety hazards, reduce or eliminate on site and off site erosion, remove invasive weed species and remove abandoned personal property when responsible parties cannot be located." Def.'s Mot. Ex. 4. The notice specifically mentioned the Roye Sum lode mine (also known as the Seymore Quartz mine), which the Forest Service considered an "abandoned mine."[4] Def.'s Mot. Ex. 4.

Shortly after the notice was published, Mr. Chittenden and Mr. Hall met with Dave Brown, an Assistant Minerals Officer for the Forest Service, who was responsible for the management of the Tahoe National Forest and the site reclamation project. Brown Decl. ¶ 6, Def.'s Mot. Ex. 1. According to his declaration, Mr. Brown "became aware for the first time that Plaintiffs Allen Hall and Gene Chittenden claimed an interest in the Roye Sum lode mining claim." Id. At the meeting, the men discussed the proposed Forest Service site reclamation project. According to Mr. Brown's declaration, Mr. Chittenden and Mr. Hall "did not raise any concerns at that time." Id. Both Mr. Chittenden and Mr. Hall, however, contest Mr. Brown's characterization and claim that Mr. Hall specifically asked whether the project would interfere with the shaft or the drift of the Roye Sum mine. Hall Decl. ¶ 1, Pls.' Cross-Mot. and Resp. to Def.'s Mot. for Summ. J. (Pls.' Cross-Mot) Ex. 3, ECF No. 17; Chittenden Decl. ¶ 1, Pls.' Cross-Mot. Ex. 2. According to Plaintiffs' description of the meeting, only after Mr. Brown assured them that "[their] area of interest was not going to be impacted" did Mr. Hall express that they had no concerns about the project. Hall Decl. ¶ 1, Pls.' Cross-Mot. Ex. 3

In November 2009, the prior claimant of the Roye Sum mine, Bill Slack, reported to the Forest Service that there was evidence of a bat colony in the mine. Brown Decl. ¶ 7, Def.'s Mot. Ex. 1.[5] In response, on March 1, 2010 the Forest Service's District Biologist emailed Mr. Brown asking whether he would inquire with the "new claimant" to see "if he is willing to allow a bat biologist access to his portal to do an assessment." Compl. Ex. 2. The biologist speculated that "installing a cupola over the air shaft" (which, at the time, was covered by a piece of sheet metal) might maintain the bat colony; the email did not mention the possibility of installing a bat gate across the mine portal. Id. Mr. Brown forwarded the e-mail to Mr. Hall asking for Plaintiffs' thoughts on the request. Id. That evening, Mr. Hall responded, explaining that "[s]ince it has been our experience that once a mine becomes active the bats leave it is our feeling that it would be a waste of resources to install a [cupola]." Id.

---

[4] The Forest Service had recorded abandoned structures and personal property at the Roye Sum mine in 2005. At that time, the Forest Service deemed the mine abandoned, and provided notice to the prior mine claimant. Brown Decl. ¶ 4, Def.'s Mot. Ex. 1.

[5] Plaintiffs allege that Mr. Slack claimed there were bats in the mine as an act of retaliation against Mr. Chittenden and Mr. Hall for claiming ownership of the Roye Sum mine. Hall Decl. ¶ 4, Pls.' Cross-Mot. Ex. 3; Chittenden Decl. ¶ 3, Pls.' Cross-Mot. Ex. 2.

4

On March 18, 2010, Mr. Brown again asked if Mr. Hall and Mr. Chittenden would "let[] a person go into the Seymore portal and survey for bats." Id. Mr. Hall wrote back that, due to a legal dispute with Mr. Slack regarding their competing claims to the mine, they were waiting for a court to resolve the matter before entering the Roye Sum mine. As a result, Mr. Hall wrote, "at this time I cannot give you guys access" and noted that the portal had been locked and he did not have a key. Id.

Nevertheless, on July 6, 2010, the District Biologist and the Regional Bat Coordinator visited the Roye Sum mine and recommended that the Forest Service install bat-friendly gates on the mine portal and the mine shaft. Def.'s Mot. Ex. 7. Plaintiffs allege that neither of them were informed that the Forest Service had conducted a bat survey. Hall Decl. ¶ 7, Pls.' Cross-Mot. Ex. 3. As a result of the survey, the American Recovery and Reinvestment Act site reclamation project plan was amended to include the installation of the two bat gates. Def.'s Mot. Ex. 7. According to the government, "[t]he purpose of the bat gates was to reduce or eliminate physical safety hazards to the public while preserving bat habitat by allowing bats to enter and exit the mine." Def.'s Suppl. Br. at 4, ECF No. 27.

The installation of the two bat gates was completed on October 12, 2010. Def.'s Mot. Ex. 8. The bat gate covering the mine shaft was made of five 36-inch steel bars. Beneath the gate, the Forest Service also installed a short length of 36-inch diameter pipe (or "culvert") inside the mine shaft. The gate across the mine portal was made of four vertical steel bars anchored into a concrete base and seven horizontal steel bars. Def.'s Mot. at 7. "In order to provide continued access into the mine," the horizontal bars were designed to be removable. Brown Decl. ¶ 9, Def.'s Mot. Ex. 1. In November, 2010, Mr. Brown provided Mr. Hall a key to allow him to remove the horizontal bars that make up the portal's bat gate so that he could access the mine. Id. ¶ 10.

### C. The Effect of the Bat Gates on Plaintiffs' Access to the Mines

Mr. Chittenden and Mr. Hall claim that the bat gate installed on the portal of the mine and the bat gate and the culvert installed on the mine shaft "[m]aterially [i]nterfere[]" with their use of the mine. Pls.' Cross-Mot. at 7 (contending that the gates have "destroyed [their] ability to use the drift and shaft" at the mine). Specifically, Plaintiffs claim that the bat gate at the portal of the mine prevents them from accessing the mine "with a [w]heelbarrow, the most basic of dirt moving tools" because the space between the vertical bars of the gate is too narrow. Hall Suppl. Decl. at 2, ECF No. 24. According to Plaintiffs' declarations, the bat gate in the portal also prevents them from engaging in "mechanized mining" because the bat gate is secured to a concrete barrier that covers the rail tracks. Id. at 3. These tracks are typically used to guide a heavy ore cart in or out of the mine; but with the concrete barrier in place, Plaintiffs claim that they cannot use "modern or basic mining machinery," which "makes the mine not economically feasible." Id. at 4.

Moreover, the Plaintiffs allege that the Forest Service made the mine shaft inoperable when it installed the second bat gate and the culvert. Mine operators, according to Plaintiffs' declarations, typically use the mine shaft with an ore cart called a "skip" to vertically remove ore and waste rock from the mine. Id. at 2. However, Plaintiffs argue that the culvert that the Forest Service installed "completely blocks use of the 'skip.'" Id.

5

Finally, Plaintiffs allege that the hoisting system in the mine shaft, which consisted of a head frame, rail, skip, and cable, was ripped out when the bat gate wasinstalled. They also claim that the installation of the gate destabilized the hillside, resulting in a landslide that covered the top of the shaft. Pls.' Cross-Mot. at 10–11.

The government, on the other hand, emphasizes that Plaintiffs can still access the mine through the removable gate. Def.'s Mot. Ex. 13. Moreover, the record reflects that Mr. Brown told Plaintiffs that once they began "stage production mining" (which would require an approved plan of operations under applicable regulations) "they could remove the gate and [the Forest Service] would bond them for the reinstallation." Id.

### D. Plaintiffs' Demand that the Gates be Removed

According to Mr. Hall, on February 24, 2012, he sent a letter to Mr. Brown demanding that the Forest Service remove the "closure of the portal and the shaft and re-stabliz[e] the hillside around the [c]ollar of the [s]haft." Hall Decl. at 13. Mr. Hall states that the District Manager of the Yuba River Ranger District of the Tahoe National Forest responded to his letter with an assertion that the bat gates did not interfere with their use of the mine, and advised them that they needed to submit a plan of operations and a bond for the reinstallation of the bat gates. Id. at 13–14.[6]

On August 8, 2012, Mr. Chittenden and Mr. Hall lodged a claim for property damage with the Forest Service using the Department of Justice's Standard Form 95, typically used in claims arising under the Federal Tort Claims Act. Compl. Ex. 1. After six months elapsed without a response from the Forest Service, Mr. Chittenden and Mr. Hall filed suit in the United States District Court for the Eastern District of California on July 8, 2013. Id. at 2; see also Chittenden v. United States, No. 2:13-cv-1351, 2013 WL 6199195, at *1 (E.D. Cal. Nov. 27, 2013).

Before the district court, Mr. Chittenden and Mr. Hall alleged ten causes of action including trespass, negligence, conversion, private nuisance, negligence per se, and the violation of their substantive and procedural due process rights. Compl. at 18, Chittenden, No. 2:13-cv-1351, ECF No. 1. The magistrate found that "gravamen of plaintiffs' complaint is that the United States' construction of a bat gate on plaintiffs' mine claim constituted a taking of plaintiffs' property in violation of the Fifth Amendment by damaging their real property and interfering with their ability to use the land for mining." Chittenden, 2013 WL 6199195, at *1. As a result, the magistrate recommended that the district court dismiss the complaint for lack of subject matter jurisdiction as the "Court of Federal Claims has exclusive jurisdiction." Id. at *1–2. On January 24, 2014, the district court issued an Order dismissing the case for lack of subject matter jurisdiction. Order at 2, Chittenden, No. 2:13-cv-1351, ECF No. 21.

### III.   The Present Complaint

Mr. Chittenden and Mr. Hall filed this action pro se on July 21, 2014. They "seek monetary damages for injuries to their real property and violation of [their] Due Process rights

---

[6] Neither letter has been submitted to the Court in connection with the cross-motions for summary judgment.

6

both Substantive and Procedural caused by the intentional, tortious, and negligent acts" of the Forest Service when it installed the bat gates over the shaft and portal of the Roye Sum mine. Compl. at 1. Quoting the magistrate's opinion, they also allege that the Forest Service's actions resulted in an uncompensated taking under the Fifth Amendment of the Constitution. Id. at 2. In support of their takings claim they allege that "the Forest Service in installing the closures has destroyed [their] ability to use the drift and shaft at the [mine] and has rendered the mine[] unworkable in [its] present condition." Id. at 11. As a result, and in light of Plaintiffs' estimated valuation of the Roye Sum mine, Mr. Chittenden and Mr. Hall request $50,000,000 in damages. Id. at 15.

The government has moved to dismiss Plaintiffs' tort and due process claims for lack of subject matter jurisdiction and requested summary judgment on Plaintiffs' takings claim. Def.'s Mot. at 4. Mr. Chittenden and Mr. Hall have responded with a cross-motion for summary judgment, arguing that the installation of the bat gates "rendered the mine closed and completely inoperable." Pls.' Cross-Mot. at 14. On October 28, 2015, the Court requested that the parties file supplemental briefs regarding the proper standard of proof to apply to Plaintiffs' takings claim, and clarification regarding the extent to which the bat gates interfere with Plaintiffs' ability to perform certain mining activities. See Order, ECF No. 21. Those briefs have been filed and the case is now ready for disposition on the parties' cross-motions.

## DISCUSSION

### I.   Motion to Dismiss under RCFC 12(b)(1)

#### A. Standard for Motion to Dismiss for Lack of Jurisdiction

In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The court may "inquire into jurisdictional facts" to determine whether it has jurisdiction. Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991). It may therefore consider matters outside of the pleadings in ruling on a motion to dismiss pursuant to RCFC 12(b)(1). See Reynolds v. Army and Airforce Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (finding that to determine jurisdiction the "court may consider relevant evidence in order to resolve the factual dispute").

It is well established that complaints that are filed by pro se plaintiffs are held to "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520 (1972). Nonetheless, even pro se plaintiffs must persuade the court that jurisdictional requirements have been met. Bernard v. United States, 59 Fed. Cl. 497, 499 (2004), aff'd, 98 Fed. App'x 860 (Fed. Cir. 2004).

#### B. Application of Standard

Under the Tucker Act, this Court is granted jurisdiction to "render judgment upon any claim against the United States founded . . . upon the Constitution . . . for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), but it does not confer any substantive rights on a

plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

The Court of Federal Claims has jurisdiction under the Tucker Act "to the extent the [plaintiff has alleged] a nonfrivolous takings claim founded upon the Fifth Amendment." Moden v. United States, 404 F.3d 1335, 1341 (Fed. Cir. 2005). Thus, so long as such a claim is not "so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy," the court should hear the complaint. Id. at 1340 (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998)).

In this case, Plaintiffs have alleged a non-frivolous claim to just compensation under the Fifth Amendment. Plaintiffs claim that the government "damage[ed] their real property and interfer[ed] with their ability to use the land for mining," and that these actions constituted a taking of their property within the meaning of the Fifth Amendment. Compl. at 2 (quoting Chittenden, 2013 WL 6199195, at *1). Therefore, this Court has jurisdiction under the Tucker Act to hear their takings claim.

On the other hand, the Court lacks jurisdiction over Plaintiffs' claims that their rights to procedural and substantive due process have been violated. Compl. at 1. As the Federal Circuit has explained, the Due Process Clause does not "mandate money damages by the Government." Smith v. United States, 36 Fed. App'x 444, 446 (Fed. Cir. 2002) (citing LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995)).

Finally, in their complaint, Plaintiffs claim that the Forest Service "intentionally, negligently and [tortiously]" damaged their private property. Compl. at 1. As set forth above, the Court's jurisdictional statute explicitly excludes tort claims from its coverage. 28 U.S.C. § 1491(a)(1) (excluding claims sounding in tort from the Court of Federal Claims' Tucker Act jurisdiction); see also Keene Corp. v. United States, 508 U.S. 200, 214 (1993) (finding that "tort cases are outside the jurisdiction of the Court of Federal Claims"). Therefore, the Court lacks jurisdiction to hear Plaintiffs' claims for damages to the extent that they are based on negligence or any intentional tort, rather than the Fifth Amendment's Takings Clause.

Accordingly, because the Tucker Act does not provide this Court jurisdiction to hear Plaintiffs' tort or due process claims, the government's motion to dismiss these claims is **GRANTED**.[7]

---

[7] Plaintiffs request that the Court transfer their tort and due process claims to the Eastern District of California. Pls.' Cross-Mot. at 19–20. The transfer statute provides that "[w]henever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed." 28 U.S.C. § 1631. "A compelling reason for transfer is that the [litigant], whose case if transferred is for statute of limitations purposes deemed by section 1631 to have been filed in the transferor court . . . will be time-barred if his case is dismissed and thus has to be filed anew in the right court." Texas Peanut

## II. Motion for Summary Judgment Under RCFC 56

### A. Standard for Summary Judgment

In accordance with RCFC 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of "identifying" the absence of any genuine issue of material fact, Celotex, 477 U.S. at 323, and all significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment, Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual, material evidence. Anderson, 477 U.S. at 248. Summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S at 322.

### B. Fifth Amendment Takings Claims

#### 1. Fifth Amendment Standards

The Fifth Amendment to the Constitution provides in pertinent part that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. "The purpose of this prohibition is to prevent [the] 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (quoting Penn Cent. Transp. Co. v. United States, 438 U.S. 104, 123 (1978)).

The Federal Circuit uses a two-part test to determine whether a compensable taking has occurred. First, the court analyzes "whether the plaintiff possesses a valid interest in the property

---

Farmers v. United States, 409 F.3d 1370, 1374 (Fed. Cir. 2005) (quoting Phillips v. Seiter, 173 F.3d 609, 610 (7th Cir. 1999)). Although Plaintiffs allege that there is a risk that their tort and due process claims will be dismissed as untimely if this Court does not transfer them, the limitations period for actions against the United States is six years. 28 U.S.C. § 2401(a). The Forest Service installed the bat gates in October 2010. Plaintiffs filed a timely administrative claim on August 8, 2012. It is unclear whether the agency ever acted on the claim. If it did, then the limitations period would not expire until six years after that action was taken—in other words, no earlier than August 2018. And the limitations period for Plaintiffs' due process or any other legal claims against the United States will not expire until October 2016 at the earliest. Accordingly, the Court concludes that a transfer would not be in the interest of justice.

affected by the governmental action, i.e., whether the plaintiff possessed a 'stick in the bundle of property rights.'" Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000). Second, "the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co., 379 F.3d at 1372; see also Estate of Hage v. United States, 687 F.3d 1281, 1286 (Fed. Cir. 2012), cert. denied, 133 S. Ct. 2824 (2013); Members of Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006).

"Real property, see Lucas v. S.C. Coastal Council, 505 U.S. 1003 (1992), tangible property, see Andrus v. Allard, 444 U.S. 51, 65 (1979), and intangible property, see Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003–04 (1984), all may be the subject of takings claims." Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003). "In assessing whether or not a Fifth Amendment property interest exists, we look for 'crucial indicia of a property right,' such as the ability to sell, assign, transfer, or exclude." Hearts Bluff Game Ranch, Inc. v. United States, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (quoting Conti v. United States, 291 F.3d 1334, 1342 (Fed. Cir. 2002)).

A "taking" can be effected based on physical appropriation of property by the government or through government regulation that goes "too far" and overly restricts the use of property. Horne v. Department of Agriculture, 135 S. Ct. 2419, 2427 (2015); see also Yee v. City of Escondido, 503 U.S. 519, 522–23 (1992) (describing "two distinct classes" of takings: (1) physical occupation of property; and (2) regulation of the use of property); Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009) ("A 'taking' may occur either by physical invasion or by regulation."); Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1378 (Fed. Cir. 2008) ("A compensable taking can occur not only through the government's physical invasion or appropriation of private property but also by government regulations that unduly burden private property interests." (citation omitted)).

Although "the government may take private property by either physical occupation or regulation . . . these two categories of takings are subject to different analyses." Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004). The analysis employed with respect to cases involving a physical occupation, "for the most part, involves the straightforward application of per se rules." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002); see also Yee, 503 U.S. at 523 ("The first category of cases requires courts to apply a clear rule . . . ."). "[R]egulatory takings jurisprudence," on the other hand, "is characterized by 'essentially ad hoc, factual inquires,'" Tahoe-Sierra Pres. Council, Inc., 535 U.S. at 322 (quoting Penn Cent. Transp. Co., 438 U.S. at 124), and is "designed to allow 'careful examination and weighing of all the relevant circumstances,'" id. (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)); see also Yee, 503 U.S. at 523 ("[T]he second [category of cases] necessarily entails complex factual assessments of the purposes and economic effects of government actions.").

### 2. Property Interest

As described above, under the Mining Act and related legislation, private parties may acquire "exclusive possessory interests in federal land for mining purposes, interests which entitle claim holders to extract and sell minerals without paying royalties to the Government."

10

Kunkes, 78 F.3d at 1551 (citing Locke, 471 U.S. at 86). But "[a]lthough unpatented mining claims are 'fully recognized possessory interests,' they partake more of the character of use rights." Id. at 1554 (quoting Locke, 471 U.S. at 107). "These possessory mineral interests are known as 'unpatented' claims to distinguish them from the ownership interest of the private owner who has obtained a 'patent,' that is, an official document issued by the United States attesting that fee title to the land is in the private owner." Id. at 1554.

Unpatented mining claims are "valid against the United States if there has been a discovery of mineral within the limits of the claim." Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336 (1963); see also Chrisman v. Miller, 197 U.S. 313, 322 (1905) (to be valid, a mining claim must be of such a character that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine"). It is well established that such a valid unpatented mining claim constitutes property protected by the Fifth Amendment against an uncompensated taking. Kunkes, 78 F.3d at 1551 (citing Best, 371 U.S. 334); see also Skaw v. United States, 740 F.2d 932, 936 (Fed. Cir. 1984).

The Bureau of Land Management is vested with the authority to determine whether an unpatented mining claim is "valid" against the United States. Freeman v. United States, 83 Fed. Cl. 530, 533 (2008) ("[A] validity determination of the mining claims is necessary to establish a compensable property interest, and a compensable property interest is a necessary element of a Fifth Amendment takings claim."); Holden v. United States, 38 Fed. Cl. 732, 735 (1997) (holding that "to have a compensable interest in unpatented mining claims sufficient to bring a taking action in this Court, there must have been a determination as to the validity of those mining claims" and that "[t]he determination of the validity of such claims is entrusted to the BLM") (emphasis in original); Payne v. United States, 31 Fed. Cl. 709, 711 (1994) ("Congress has given the Department of Interior the power in the first instance to inquire into the validity of mining rights claimed against the Government.").

In this case, BLM has not made a validity determination with respect to Plaintiffs' claims. Because such a validity determination is a pre-requisite to finding that Plaintiffs possess a property interest within the meaning of the Fifth Amendment, and because BLM is entrusted with primary jurisdiction over such determinations, Plaintiffs have failed to submit sufficient evidence to establish that they possess a cognizable property interest in their mining claims. Therefore, Plaintiffs' motion for summary judgment must be denied.

### 3. Taking

In previous cases before the Court of Federal Claims where, as here, the BLM had not yet validated a plaintiff's mining claim, the court has either dismissed the takings claim or stayed the case in order to allow validity proceedings to take place. See, e.g., Vane Minerals (US), LLC v. United States, 116 Fed. Cl. 48, 62 (2014) (dismissing for failure to state a claim); Hall v. United States, 84 Fed. Cl. 463, 471–72 (2008) (granting stay); Freeman v. United States, 83 Fed. Cl. 530, 532–33 (2008) (staying the case pending validity proceedings); Payne v. United States, 31 Fed. Cl. 709, 712 (1994) (same). In this case, the government urges the Court to do neither. Rather, the government asks the Court to assume for purposes of deciding its motion for summary judgment that Plaintiffs' claims are valid. Def.'s Mot. at 3. It further requests that the

11

Court enter summary judgment in its favor on the grounds that, as a matter of law, the installation of the bat gates did not result in a taking of any property interest Plaintiffs have in their unpatented mining claims. Id. at 2.

The Court agrees that, even assuming the Plaintiffs claims are valid, summary judgment in favor of the government is appropriate in this case. As described above, the owner of an unpatented mining claim does not have a fee simple interest in the land itself; rather, he has a possessory interest in the minerals that are within the limits of his claim and a right to use the land for mining purposes. See Best, 371 U.S. at 335–36; Freese v. United States, 6 Cl. Ct. 1, 14 (1984). Thus, while a valid unpatented mining claim bestows a property interest for purposes of the Fifth Amendment's Takings Clause, an individual's property interest in their valid, unpatented mining claim is subject to the government's authority to impose reasonable regulations. Locke, 471 U.S. at 105. Claimants "must take their mineral interests with the knowledge that the Government retains substantial regulatory power over those interests." Id.

Where, as here, a mine is located in a national forest, a mining claimant's property interest is subject to its compliance with regulations governing mining operations that are issued by the United States Forest Service. Aloisi v. United States, 85 Fed. Cl. 84, 92 (2008) (noting that the "Forest Service has the ultimate authority to approve or reject proposals to conduct mining operations in the national forests"); see also 16 U.S.C. § 551 (giving the Secretary of Agriculture authority to promulgate rules and regulations to protect the national forests); 30 U.S.C. § 612(b) (mining claims are "subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States)"); Pub. Lands for the People, Inc. v. U.S. Dep't of Agric., 697 F.3d 1192, 1197 (9th Cir. 2012) (rejecting arguments of mine claim holders that the Forest Service lacked authority to restrict their use of motor vehicles to access their mining claims pending approval of plan of operations and noting that "[t]he Forest Service's extensive statutory authority dooms this challenge"); Clouser v. Espy, 42 F.3d 1522, 1531 (9th Cir. 1994) (upholding the Forest Service's authority to regulate mining activity within national forests); Freese, 6 Cl. Ct. at 14 (claimants' rights to use land in a national forest for mining purposes are "subject to the superior right of the United States to regulate uses of the surface resources within the [National Forest]").

In this case, the Forest Service was ostensibly exercising its statutory authority to maintain and protect the surface resources of the Tahoe National Forest when, in order to protect wildlife and promote public safety, it installed bat gates on the portal and shaft of the Roye Sum mine. See Def. Suppl. Br. at 4 ("The purpose of the bat gates was to reduce or eliminate physical safety hazards to the public while preserving bat habitat by allowing bats to enter and exit the mine.").[8] The exercise of this authority could effect a compensable taking only if, by installing

---

[8] To the extent that Plaintiffs claim that the Forest Service exceeded its statutory authority under 30 U.S.C. § 612(b) when it installed the bat gates, see Pls.' Cross-Mot. at 12, the Court cannot entertain that claim. As the Federal Circuit has ruled, "an uncompensated taking and an unlawful

12

the bat gates, the Forest Service either "physically appropriated" or "denied [Plaintiffs] meaningful access" to their mining claims. Washoe Cty., Nev. v. United States, 319 F.3d 1320, 1327 (Fed. Cir. 2003) (holding that where the government "neither physically diverted or reduced the amount of water accessible by Appellants nor denied all meaningful access to their water rights, it did not effect a physical taking"); see also Foster v. United States, 607 F.2d 943, 950 (Ct. Cl. 1979) (finding a taking of mineral rights attached to air force base property where "[i]n order to quarry the dolomite, plaintiffs would require the use of military reservation roads to which defendant has indicated that no access would be allowed due to its detrimental impact on base operations").

It is undisputed in this case that the government has not physically appropriated any minerals that might lie within the boundaries of Plaintiffs' mining claims. Further, because Plaintiffs' mining claims are unpatented, they have no ownership interest in the land on which those claims are located. The Forest Service's placement of the bat gates on the portal and shaft of the mine therefore does not constitute the kind of physical occupation of an owner's property that the Supreme Court held constituted a per se taking in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 432 (1982).

Further, the undisputed facts in the record establish that the installation of the bat gates has not denied the Plaintiffs meaningful access to their mining claims. As noted, Plaintiff's property interest in their claims is subject to the Forest Service's mining regulations. And, as discussed, the regulations require that claimants submit a "notice of intent" to operate if their

---

government action constitute 'two separate wrongs [that] give rise to two separate causes of action.'" Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (alteration in original) (quoting Del Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1364 (Fed. Cir. 1998)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1369–70 (Fed. Cir. 2005) (distinguishing "between the valid exercise of the Court of Federal Claim's [sic] jurisdiction over a takings claim when the claim was that 'property was taken regardless of whether the agency acted consistently with its statutory and regulatory mandate' and the bar to such jurisdiction when 'the plaintiff claims it is entitled to prevail because the agency acted in violation of statute or regulation'" (quoting Rith, 247 F.3d at 1366))). Because Plaintiffs brought suit in this Court, alleging a taking, the Court must assume that the Forest Service acted within its statutory authority when it installed the bat gates. Del-Rio Drilling, 146 F.3d at 1363–64; see also Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) (holding that a "claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act"); Rith, 247 F.3d at 1365 (observing that "a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims"); cf. United States v. Curtis-Nevada Mines, Inc., 611 F.2d 1277, 1286 (9th Cir. 1980) (mining claimant who believes surface use materially interferes with mining within the meaning of section 612(b) "can protest to the managing federal agency about public use which results in material interference and, if unsatisfied, can bring suit to enjoin the activity").

operations "might cause significant disturbance of surface resources." See 36 C.F.R. § 228.4. It is undisputed that Plaintiffs have declined to submit such a notice for review.[9] Accordingly, under the regulations, they currently may engage only in a limited set of activities (i.e., those that will not cause a significant surface disturbance). See id. Specifically, Mr. Chittenden and Mr. Hall may access the mine to prospect and sample for mineral deposits, as permitted by 36 C.F.R. § 228.4(a)(1)(ii). Further, Plaintiffs cannot currently engage in any operations that would require the use of a motor vehicle because the road leading to the mine portal is not designated for motorized use absent prior written authorization, which the Forest Service grants as part of the plan of operations approval process. Brown Suppl. Decl. ¶ 7, Def.'s Suppl. Br. Ex. 1.

The bat gates do not deny Plaintiffs meaningful access to the mine for purposes of conducting the permitted activities. As explained, the gate across the mine portal has removable bars that were designed to allow Plaintiffs access to the mine. Mr. Brown asserts that, based on his experience as an Assistant Minerals Officer and his personal knowledge of the bat gates installed at the mine portal and shaft, "the bat gates currently installed do not prevent Mr. Chittenden and Mr. Hall from performing underground operations that will not cause a significant surface resource disturbance." Id. ¶ 13. Mr. Brown asserts that prospecting and sampling generally "will not involve removal of more than a reasonable amount of mineral deposit for analysis and study which generally might include searching for and occasionally

---

[9] Plaintiffs' refusal to submit a plan of operations is apparently based upon their belief that the Forest Service has no statutory authority to require one. See Chittenden Decl. ¶ 7, Pls.' Cross-Mot. Ex. 2 (acknowledging that it was true that Plaintiffs had not submitted a plan of operations, and explaining that "[i]n the three years I have been studying mining law I have come to realize that nowhere is the Forest Service granted the authority to manage minerals"). They contend that "all phases of underground mining, [i.e.,] drilling, blasting, and mucking out . . . are [exempt] from a Plan of Operations" because "the Forest Service [has no] authority underground." Chittenden Suppl. Decl. ¶ 7, ECF No. 23. They maintain that 36 C.F.R. § 224.8(a)(1)(iv) permits all underground activity because the Forest Service is limited to "[managing] the 'vegetative surface.'" Chittenden Decl. ¶ 7, Pls.' Cross-Mot. Ex. 2.

The Plaintiffs' challenge to the Forest Service's authority to require them to submit a plan of operations is of dubious merit, given the breadth of the Secretary of Agriculture's statutory authority to promulgate "reasonable rules and regulations which will protect the national forests and which will help to carry out the purposes for which the national forests were created." See United States v. Weiss, 642 F.2d 296, 298 (9th Cir. 1981); see also United States v. Doremus, 888 F.2d 630, 632 (9th Cir. 1989) (holding that "[t]he regulatory scheme of requiring a notice of intent to operate and approval of an operating plan is a reasonable method of administering the statutory balance between 'the important interests involved here [which] were intended to and can coexist'" (quoting Weiss, 642 F.2d at 299 (second alteration in original))). In any event, any challenge to the legitimacy of the Forest Service's demand that Plaintiffs submit a plan of operations must be pressed either through a suit in district court under the Administrative Procedures Act, 5 U.S.C. §§ 701–06, or by pursuing the matter through the Forest Service's appeal procedure, see 36 C.F.R. § 214.4(b); Curtis-Nevada Mines, Inc., 611 F.2d at 1286.

14

removing small mineral samples or specimens, gold panning, metal detecting, non-motorized hand sluicing, using battery operated dry washes, and collecting of mineral specimens using hand tools." Id. ¶ 8; see also id. ¶ 9 (describing "non surface disturbing mining activities" as consisting of "underground exploration activities, including chip sampling, metal detecting, and the use of hand tools such as shovel, chisel, rock, pick and hammer").

In their declarations, Mr. Chittenden and Mr. Hall do not assert that the bat gates prevent them from engaging in prospecting and sampling. Instead, they assert that the opening of the bat gate "is too small to admit a wheelbarrow through it," "the most basic of dirt moving tools." Chittenden Suppl. Decl. ¶ 1. Mr. Chittenden also notes that the concrete foundation that supports the bat gate across the portal covers the rails used to allow an "ore cart [to] enter or exit the mine." Id. ¶ 5; see also Chittenden Decl. ¶ 5, Pls.' Cross-Mot. Ex. 2 (claiming that the opening through the bat gate is "too narrow to take in an Ore car, a slusher, a mucking machine, or a timber car . . . . [t]ools very necessary for mining"). Finally, Plaintiffs explain that because of the installation of the bat gates, they are prevented from installing and using mining equipment and are therefore "unable to operate the mines." Pls.' Cross-Mot. at 16–17.

These factual assertions are insufficient to show that a taking has already occurred because they do not establish that the bat gates have prevented Plaintiffs from exercising their current rights to prospect, sample, or engage in similar activities that will not significantly disturb surface resources. And to the extent that the Plaintiffs intend to press a takings claim that is based on the theory that the bat gates would prevent Plaintiffs from engaging in mechanized mining operations, that claim is not ripe for review at this time because—without an approved plan of operations—it is impossible to know what activities (if any) will be permitted and what impact (if any) the gates will have on those activities. See Palazzolo, 533 U.S. at 618–19 (takings claim not ripe where jurisprudential factors for determining a taking "cannot be resolved in definitive terms until a court knows 'the extent of [the] permitted development'" (quoting MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 351 (1986))). In addition, the Forest Service has agreed to work with Plaintiffs on a plan to remove the gates once there is an approved plan of operations in place, subject to Plaintiffs' compliance with the regulatory requirement that they post a bond for their reinstallation after their mining operations end. Def.'s Mot. Ex. 13.

In short, while Plaintiffs may ultimately be required to incur additional expense to post a bond that will fund the restoration of the gates at the conclusion of their mining activities, the installation of the bat gates "has not deprived [Plaintiffs] of the ability to develop the[ir] claims." Freese, 6 Cl. Ct. at 14. Mr. Chittenden and Mr. Hall "may still develop [their] valid mining claims any way [they] see[] fit," provided they comply with applicable Government regulations. Id. Therefore, even assuming that Plaintiffs have a property interest in their unpatented mining claims, there has been no taking of that interest within the meaning of the Fifth Amendment, and the government is entitled to summary judgment as to Plaintiffs' Fifth Amendment Taking claims.

## CONCLUSION

For the foregoing reasons:

1. The government's motion to dismiss Plaintiffs' tort and due process claims is **GRANTED** and those claims are dismissed without prejudice; and

2. The government's motion for summary judgment as to Plaintiffs' Fifth Amendment takings claim is **GRANTED**; and

3. Plaintiffs' cross-motion for summary judgment is **DENIED**.

The Clerk is directed to enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

_____
ELAINE D. KAPLAN
Judge, U.S. Court of Federal Claims